ALBERT HEIDEGGER et al., Appellants, v. MET-
ROPOLITAN STREET RAILWAY COMPANY
and KANSAS CITY, Respondents.

### Kansas City Court of Appeals, April 4, 1910.

1. **STREET RAILWAY FRANCHISE: Rights of Owners of
   Property Abutting on Street: Rerouting of Cars.** Where a
   street railway company having a franchise to run cars over a
   public street is required by a city ordinance to change the rout-
   ing of the cars running over such street, no legal rights of
   property-owners on such street are impaired because of the
   problematical fear that the character of the class of patrons on
   its cars may be changed, and the value of real estate on the
   street decreased, such persons still having the same transpor-
   tation at the same price. Such property-owners hold title sub-
   ject to the contingencies of changes of fortune of the various
   localities of the city.

2. ———: ———: ———. The necessity of street car patrons
   having to change cars is not an infringement of any right to
   a continuous trip.

3. ———: ———: ———. The inhibition of the charter of
   Kansas City against placing a street car line on a street with-
   out the consent of the abutting property-owners puts the prop-
   erty-owner in no different relation than it would have been with-
   out such inhibition. The property-owner has no better right
   than the public at large to interfere with the reasonable opera-
   tion of the street railway.

4. ———: ———: ———. The ordinance constituting a re-
   newal of the franchise of the street railway company, known
   as the Peace Agreement, reserves to the city the right to change
   the routing of street cars. This reservation was valid, and in-
   fringes no rights of the owners of property on the street in
   question.

Appeal from Jackson Circuit Court.—*Hon. E. E. Por-
terfield,* Judge.

AFFIRMED.

*Cook & Gossett* for appellant.

(1) The consent of the owners of the majority of
front feet of property upon the line of the railroad loca-

ted on public streets was necessary to a franchise to construct, maintain and operate such railway. Statutory Charter of 1875; see Laws of Missouri, 1875, p. 209, sec. 8; Kansas City Charter of 1888, sec. 2, art. 12, p. 233; see Charter and Revised Ordinances of 1898; Kansas City Charter of 1908, sec. 4, art. 16, p. 219. (Each of these last two charters have saving clauses and exceptions of existing rights and obligations under previous charter.) See sec. 10, art. 12, p. 233, charter of 1888; and sec. 8, Enabling Act of 1887, Laws of 1887, p. 44; also sec. 12, art. 8, p. 227, charter of 1908; also secs. 1187 and 6119, R. S. Mo. 1899. (2) Without the consent of abutting property-owners a franchise is void and an attempt to operate under a franchise in a manner different from the right given by the franchise is illegal. Carthage v. Railway, 97 Mo. App. 20; Railway v. Kirkwood, 159 Mo. 239; Ransom v. Railway, 104 Mo. 375; Railway v. Davis, 197 Mo. 669; State ex rel. Crow v. Railway, 146 Mo. 155; Springfield v. Railway, 85 Mo. 674; Heer v. Railway, 41 Mo. App. 63; 23 Am. and Eng. Ency. (2 Ed.), 692; Lehigh Co. v. Inter, Etc., Co., 31 Atl. Rep. 471; South Beach Railway case, 53 Hun 131 (N. Y.) ; affirmed 119 N. Y. 141; same case 23 N. E. 486; Railway v. Neare, 54 Ohio St. 153; same case 42 N. E. 768; Roberts v. Easton, 19 Ohio 78. (3) A railroad under franchise for the same should be operated as a whole and extensions are a part of the whole. State ex rel. Crow v. Railway, 146 Mo. 171; Railway v. Davis, 197 Mo. 669; Springfield v. Railway, 85 Mo. 674. (4) Even proper authority to change a route is no authority to change the termini. 23 Am. and Eng. Ency. (2 Ed.), 692, citing Snook v. Railway, 83 Ga. 61; Atty. Gen. v. Railway, 36 Wis. 466. (5) The city's attempt to so change the franchise in which the railway company is attempting to acquiesce is not an exercise of police power. State v. Laclede Gas Co., 102 Mo. 472; Sloan v. Railway, 61 Mo. 24; K. C. v. Corrigan, 86 Mo. 67, and 85 Mo. 263; St. Louis

v. Telephone, 96 Mo. 623; State v. Julow, 129 Mo. 163; 22 Am. and Eng. Ency. (2 Ed.), 938 and 939; Nellis on Surface Railways, pp. 26, 42, 42 note, and 78. (6) Injunction is the proper remedy for a nonconsenting property-owner. Heer v. Railway, 41 Mo. App. 63; Sugar Co. v. Elevator Co., 82 Mo. 121; Ransom v. Railway, 104 Mo. 375; Cummings v. St. Louis, 90 Mo. 259; Swinhart v. Railway, 207 Mo. 423.

*John T. Harding* and *James W. Garner* for respondent, Kansas City, and *John H. Lucas,* for Metropolitan Street Railway Company, filed brief jointly.

(1) The ordinance was passed in pursuance of the police power of the city, which is defined as the power of organization of a system of regulation tending to the health, order, convenience and comfort of the inhabitants. Cyc. of Law and Pro., vol. 31, p. 902; A. & E. Enc. of Law (2 Ed.), vol. 22, p. 916; Sluder v. Transit Co., 189 Mo. 107; State v. Addington, 77 Mo. 117. (2) The city through its common council, has control of the streets and highways in said city and has the power to regulate the use of the same. Charter of Kansas City, sec. 11, p. 133; Charter of Kansas City, sec. 28, p. 157; Enabling Act 1909, sec. 9752, City Charter, p. 83; also R. S. 1899, sec. 6408; also Act 1909, sec. 9753, R. S. 6410. (3) These provisions of the preceding Enabling Act were included in the Enabling Act of 1909. Kinney v. Barber Asphalt Pav. Co., 86 Mo. App. 573; State ex rel. v. Fields, 99 Mo. 352; St. Louis v. Telegraph Co., 189 Mo. 129; Nellis on Railways, pp. 214, 215, 216, 217. (4) The power of regulation is a legislative power conferred upon the common council by the Enabling Act. Nellis on Railways, pp. 214-217; Railway v. Kirkwood, 159 Mo. 251. (5) This regulation must be by the common council and by the passage of an ordinance. City of Springfield v. Railway, 69 Mo. 514;

142 App—22

(6)   The city possesses the power of control and regulation and this is a continuing power.   Merz v. Railway, 14 Mo. App. 400; Elliott on Roads and Streets, sec. 759, p. 816; also sec. 760, p. 817.    (7)   The city has a right to regulate number of  passengers carried on car. City of St. Louis v. Railway, 89 Mo. 44; City of St. Louis v. Railway, 14 Mo. App. 224; Lamb v. Railway, 33 Mo. App. 489; State v. Whittaker, 160 Mo. 60.

BROADDUS, P. J.—This is a suit, by injunction, to restrain the city of Kansas City, Missouri, and the Metropolitan Street Railway Company, from rerouting the latter's street cars on what is known as the Vine street line.   The line, as now operated under the company's franchise, extends from Eighteenth street on Vine to Woodland, then to Thirty-first street, thence to its terminus south, at Forty-fifth street.   Under the proposed rerouting the cars are to be operated from points south of Woodland avenue to Thirty-first street, thence west to Holmes street, thence north to the business districts of the city, and return over the same route.   Travelers going on the Vine street line will be compelled to change cars at Thirty-first street going  north  or south.

The petitioners are property-owners abutting on the line north of Thirty-first street, between Twenty-ninth and Thirtieth streets, between Twenty-seventh and Twenty-eighth streets, and between Twenty-fourth street and Howard avenue.

The  franchise for the street railway was first granted to Anderson, Gentry, and others. A corporation known as the South Suburban Railway Company succeeded to the rights of the former in 1893.  The latter obtained a franchise from the county for a  railway from Thirty-first street south on Woodland avenue, that part being then outside of the city limits.  Afterwards, in June 1893, the city gave to said company a franchise to connect its Vine street line with the Wood-

land line south of Thirty-first street. This ordinance recited that the owners of a majority of the front feet of the real property fronting on the streets described had consented to the franchise, which was a necessary prerequisite under the city's charter.

In July, 1902, an ordinance was passed applying to every line of street railway in the city, in which it is provided among other things as follows: "It is expressly agreed and understood that the city reserves any right it may have to control and regulate the matter of the routing of the cars on all the lines herein referred to, and all enlargements of the same, whether made by construction, purchase, lease or otherwise, it being the agreement and intention that the city shall retain any right it has to control the routing of all street cars within the limits of the city, as the said limits are now established or shall be hereafter enlarged." The ordinance contains what is known as "The Peace Agreement," entered into between the city and the street railway companies owning and operating street car lines within the city limits.

The grounds upon which petitioners seek the aid of an injunction are alleged as follows:

"Plaintiffs further state that they and each of them and other persons as aforesaid using said Vine street car line have frequent and divers occasion to use the same as a continuous operated line of street railroad and the fact that the same is and has been a continuous line of street railroad is of a great advantage and benefit to their said properties and of material financial value thereto and that the cessation of the operation of said street car line as a continuous line upon which cars are operated from and between the present termini will cause great and irreparable injury to the plaintiffs and greatly depreciate the value and injure their said properties and render the same of materially less value and worth than the same now are.

"Plaintiffs further state that the said defendant in-

tends and threatens as aforesaid to cease the operation of its cars on said Vine street line of railroads as a continuous and through operated car line and that the said act of the defendant so threatened and intended to be carried out will be in violation of and contrary to its said franchises and rights in that it will be a diversion of said continuous car line into two lines of street railroad instead of one continuous line as the same now is, that is to say, said street railroad will be one line from the north having a terminus at Thirty-first street and Woodland avenue and another line from the south, having a terminus at or about Forty-fourth street and running by way of Woodland avenue to Thirty-first street and thence west on Thirty-first street to Holmes street and thence north into the down town district of the city and plaintiffs allege and state that the said operation of said street car railroad will not be the operation of the same as one continuous and uninterrupted line for the continuous passage and operation of cars without necessity of change from car to car by the passengers."

The evidence introduced as tending to show damage to petitioners is that many negroes live on the line between their, the petitioners', property and Eighteenth street; and that the rerouting of the cars would be an incentive to the negroes to move further to the south towards the petitioners' properties which would depreciate its value; and that it would depreciate the service and convert it into a "negro stub-line."

We are unable to see why the rerouting would tend to depreciate the service on the Vine street lines, and if it did the petitioners would have a remedy. Under the franchise the company is bound to render efficient service and if they fail to do so the city can compel it to properly comply with its duty in that respect. But whether the service on the line will depreciate in efficiency is purely problematical, and the same may, with equal propriety, be said as to the al-

leged movement of the negro population to the proximity of petitioners' property.

And we do not think that the proposed rerouting would have the effect of breaking the continuity of the Vine street line. It is true that there would have to be a change of cars at Thirty-first street, but the line would be continuous with the payment of a single fare. The mere fact of a change of cars would not prevent the line from being a continuous one. It would operate at most to an inconvenience which residents of the city are likely to encounter in traveling from one part of the city to another.

The case can be determined on other grounds. It is conceded that the building and operation of the street railway was not the invasion of any constitutional right of the petitioners as it did not amount to the taking of their property or damaging it, for which they were entitled to compensation. And it may as well be conceded that the inhibition of the charter against the construction and operation of a line of the street railway on the street upon which petitioners' property abuts, without their consent having been obtained, places them in no different relation towards the company than it would have been if no such inhibition had existed. They acquired no right thereby to interfere with a reasonable maintenance and operation of the railway other than that of the general public. It has not been shown that the rerouting will in any manner interfere with a reasonable and efficient service on the Vine street line, and until it is so shown the petitioners have no standing in a court of equity.

In the so-called "Peace Agreement" the city acting for and in behalf of the public reserved to itself the right to regulate the rerouting of cars on all the street railways within the city. The company recognizes the right of the city to do so. The reservation is not contrary to public policy. It is not prohibited by the Constitution or other law of the land. It was

a matter of contract between the city and the company to which the petitioners were not parties except in the same relation as the general public. It was a reservation in the "Peace Agreement" of the right of the city to regulate the routing of cars within its limits. The city has since grown and perhaps will continue to grow until it contains a vast population and will experience many changes. Streets that are now suitable for the maintenance and operation of street cars may become so congested that they can be no longer utilized and other streets may be more suitable for the purpose and at the same time better serve the necessities of the public. In such mutations of time, the values of property will be affected. In some sections it will decrease, in others increase in value. But in such changes of value the general public is not concerned. If the good of the general public is subserved by the action of the city in regulating the routing of the street cars in its limits, the purpose and intent of its charter powers under "The Peace Agreement" is accomplished. Those who may suffer thereby in the depreciation of the property have no legal right to complain. They hold the titles subject to the contingencies of fortune, as every other man does, and they have no right that the fortuitous advantages they now enjoy shall be perpetuated to the disadvantage of the public at large.

Petitioners have no equity in the case that appeals to the conscience of the court. The judgment of the trial court dismissing plaintiffs' cause is affirmed. All concur.